## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Stephen E. Lieberman et al.,

     Plaintiffs,

   vs.

A&W Restaurants, Inc. et al.,

     Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 02-2930 ADM/AJB

---

Timothy D. Kelly, Esq., Kelly & Berens, PA, Minneapolis, MN, on behalf of Plaintiffs.

Todd Wind, Esq., Fredrikson & Byron, PA, Minneapolis, MN, on behalf of Defendants.

---

## I. INTRODUCTION

    This matter is before the undersigned United States District Judge pursuant to Plaintiffs'

Stephen E. Lieberman et al. (collectively, "Plaintiffs") Objection [Docket No. 16] to the April 3,

2003 Report and Recommendation ("R&R") of Magistrate Judge Arthur J. Boylan [Docket No.

14]. After receiving the parties' written submissions, the matter was taken under advisement on

April 29, 2003. The R&R recommended that the Motion to Dismiss [Docket No. 6] of

Defendants A&W Restaurants, Inc. et al. (collectively, "Defendants") be granted on all five

counts of the First Amended Complaint ("FAC") [Docket No. 13]. For the reasons set forth

below, the R&R is adopted. The factual background for this matter is adequately set forth in the

R&R and is incorporated by reference for the purposes of the present objections.

MAY 2 8 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## II. DISCUSSION

A district court shall make an independent, *de novo* evaluation of those portions of the R&R to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); D. Minn. LR 72.1(c)(2).

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss claims for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss, the pleadings are construed in the light most favorable to the non-moving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879 80 (D. Minn. 1993). Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the non-moving party, and the court must draw all reasonable inferences in the non-moving party's favor. Ossman, 825 F. Supp. at 880; White Stone Partners, L.P. v. Piper Jaffray Cos., 978 F. Supp. 878, 879 (D. Minn. 1997).

A complaint should be dismissed "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations." Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995) (citations omitted); Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir. 1996). "A motion to dismiss should be granted as a practical matter . . . only in the unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." Frey, 44 F.3d at 671.

Plaintiffs object to Judge Boylan's recommendation to dismiss all five counts of the FAC.

2

**A.      Count One (Breach of Contract – Impairment of Warrant Rights)**

Plaintiffs assert that they are "far less likely today to be able to recapture the . . . price reduction through the exercise of the Warrants than they would have been if the Merger and the Share Exchange had never occurred." FAC ¶ 38.  Essentially, Plaintiffs allege that they can no longer "reasonably expect" an initial public offering ("IPO") for A&W Restaurant Holdings, Inc. ("A&W"), because A&W is no longer "poised to engage in an IPO" as a result of the acquisition of Yorkshire Global Restaurants, Inc. ("Yorkshire") by TRICON Global Restaurants, Inc. ("TRICON"), and therefore the ability to exercise their warrant options is diminished or eliminated.  Id. ¶ 58.  The parties agree that Plaintiffs' rights to purchase stock in the prescribed amounts are still extant and could be exercised in the event of an IPO of A&W stock.  Id. ¶ 38.  However, the parties dispute the scope of the rights granted by the Common Stock Purchase Warrant ("Warrant").  Compl. Ex. A.  Plaintiffs assert that while it is still possible for A&W to engage in an IPO triggering their Warrants, the rights under the Warrants have been impaired in violation of the Warrant terms because the likelihood of the A&W IPO occurring has been diminished through Defendants' actions.

The Warrant describes the rights as: "Right to Purchase a Certain Number of Shares of Common Stock of Sagittarius Acquisitions Incorporated."  Id.  The Warrant states that:

> [Plaintiffs are] entitled, subject to the terms set forth below, to purchase from the Company [Sagittarious Acquisitions Incorporated and its successors] at any time after the completion of the IPO, and before . . . the tenth anniversary of the effective date of the IPO, that number of fully paid and nonassessable shares of Common Stock, par value $0.0001 per share, of the Company (the "Common Stock") determined by dividing Thirty Four Thousand Five Hundred Dollars ($34,500) by the price per share to the public received by the Company . . . in its initial underwritten public offering of Common Stock (the "IPO").

Compl. Ex. A. Paragraph three of the Warrant includes provisions for adjustment in the event of

a reorganization, consolidation or merger:

> In case at any time or from time to time, the Company shall (a) effect a
> reorganization, (b) consolidate with or merge into any other person, or (c) transfer all
> or substantially all of its properties or assets to any other person under any plan or
> arrangement contemplating the subsequent dissolution of the Company, then, in each
> such case, this Warrant shall continue in full force and effect and the terms hereof
> shall be applicable to the shares of stock and other securities and property receivable
> on the exercise of this Warrant after the consummation of such reorganization,
> consolidation or merger . . . and shall be binding upon the issuer of any such stock
> or other securities, including, in the case of any such transfer, the person acquiring
> all or substantially all of the properties or assets of the Company, whether or not such
> person shall have expressly assumed the terms of this Warrant . . . .

Id. ¶ 3. The Warrant also contains a "No Dilution or Impairment" clause:

> The Company will not, by amendment of its Certificate of Incorporation or through
> any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale
> of securities or any other voluntary action, avoid or seek to avoid the observance or
> performance of any of the terms of the Warrants, but will at all times in good faith
> assist in the carrying out of all such terms and in the taking of all such action as may
> be necessary or appropriate in order to protect the rights of the holders of the
> Warrants against dilution or other impairment.

Id. ¶ 6. Plaintiffs allege Defendants have violated the no-impairment clause in three ways: (1) by

effecting the stock exchange between Yorkshire and A&W, thereby impairing Plaintiffs' interests

in their Warrants for A&W stock because Yorkshire, not A&W, was then poised for an IPO, (2)

by failing to issue to Plaintiffs substitute warrants in Yorkshire, and (3) by subsequently merging

Yorkshire with Tricon, an already existing public entity, thereby "parking" Plaintiffs' Warrants at

the subsidiary level of a large public company with little chance of the subsidiary ever going

public, while at the same time not retiring Plaintiffs' Warrants as "subsidiary warrants." FAC

¶¶ 23-38, 41-42.

Plaintiffs primarily rely on three cases for the proposition that an issuer of a warrant may

4

not take steps to destroy the value of the warrant.  The first, <u>Federal Deposit Ins. Corp. v. First Heights Bank, FSB</u>, 229 F.3d 528 (6th Cir. 2000), addressed the ambiguity in an Assistance Agreement requiring the defendant to share with the plaintiff twenty-five percent of a tax savings realized as a result of the agreement.  <u>Id.</u> at 534.  Plaintiff Federal Deposit Insurance Corporation's ("FDIC") alleged that a defendant violated a section of the agreement prohibiting actions that dilute the warrants.  <u>Id.</u> at 540 ("[T]he ACQUIRER . . . shall not . . . take any other action which would have the effect of diluting the [FDIC] warrants.").  The Sixth Circuit held that the anti-dilution provision "must be interpreted to prevent the dilution of the 'value' of the FDIC's warrants and not the ownership interest percentage."  <u>Id.</u> at 541.  The Sixth Circuit stated that the provision did not protect the FDIC from risks associated with general business operations, such as invariable stock price fluctuations on the open market, but that the alleged dilution "directly resulted from actions taken by [a defendant]," and therefore constituted a breach of the anti-dilution provision.  <u>Id.</u>

The <u>FDIC</u> decision bears similarity to the facts here in that the stock exchange of A&W with Yorkshire, and then Tricon, were actions initiated by the Defendants.  Whether or not it is reasonable to equate Defendants' decisions to exchange shares with Yorkshire and merge with Tricon as general business operations akin to stock market fluctuations as unpredictable uncertainties is discussed below.

The second case, <u>Cofman v. Acton Corp.</u>, 958 F.2d 494 (1st Cir. 1992), involved a settlement agreement whereby plaintiffs were granted as a "sweetener," in place of stock warrants, the right to make a one-time demand on the defendant corporation for payment calculated from the price of the corporation's stock.  <u>Id.</u> at 495.  Subsequently, the defendant

5

executed a "reverse stock split," causing each shockholder to own one-fifth of the original number of shares held, with the new shares having five times the par value. Id. at 496. Defendants then sought to amend the "sweetener" agreement to multiply the stock payment calculation number by five, and plaintiffs objected and sued, asserting the agreement terms were unambiguous and integrated. Id. The First Circuit found that the parties had not considered dilution in the drafting of the agreement, and that such omission was an ambiguity. Id. at 497. The First Circuit held that: "'It defies common sense' that [the plaintiffs] would have agreed that [the defendant] could effectively escape the sepcified consequences of a rising market price by increasing the number of shares . . . [a]nd it would follow . . . [defendant] should not suffer from any decreasing." Id. (internal citations omitted). The Court noted that "a contract is to be construed as meaningful and not illusory," and that "contracts cannot be rewritten simply to 'rescue [a party] from a sinkhole of its own design.'" Id. (internal citation omitted). The Court concluded that to read the contract as meaning that the plaintiffs should not suffer by dilution "is a necessity, or 'essential to a determination' [of the contract's meaning.]" Id. The First Circuit then rejected a "wooden" construction of the agreement, holding that "[t]here is every reason to presume [plaintiffs] did not intend to acquire nothing, and saving from unenforceability ranks as a necessity." Id. (internal citations omitted).

Cofman more closely parallels this case, and supports Plaintiffs' argument because the warrants here were allegedly included for the purpose of "making up for" a certain amount of purchase price. That is, Plaintiffs assert that the Warrants functioned as a form of "sweetener" for the deal, providing the likely promise of a future return substantial enough to offset part of the purchase price. FAC ¶ 8. Assuming the truth of the allegation for purposes of a motion to

6

dismiss, the First Circuit's construction of the agreement in favor of the plaintiffs because they "did not intend to acquire nothing" can be analogized to Plaintiffs' alleged intended function of the Warrants here. However, the parties here did contemplate possible dilution at the time of the issuance of the Warrants, and the no-impairment provision specifies that Defendants must "protect the rights" of Plaintiffs against dilution or impairment. Compl. Ex. A ¶ 6. What constitutes the protectable "rights" under the clause is discussed further below.

The third case, Reiss v. Financial Performance Corp., 97 N.Y.2d 195 (N.Y. 2001), addressed whether or not warrants to purchase stock shares of defendant corporation must be adjusted in light of a reverse stock split authorized by defendant after plaintiffs received the warrants. Id. at 197. The Court of Appeals of New York stated:

> Duly executed stock warrants are contracts entitling the holder to purchase a specified number of shares of stock for a specific price during a designated time period. Here, the warrants are enforceable according to their terms. They have all the material provisions necessary to make them enforceable contracts, including the number of shares, price, and expiration date, and were drafted by sophisticated and counseled business persons. . . . '[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.'

Id. at 198 (internal citations omitted.). The court refused to imply a term "where the circumstances surrounding the formation of the contract indicate that the parties, when the contract was made, must have foreseen the contingency at issue and the agreement can be enforced according to its terms." Id. at 199. The court noted that the warrant contracts not addressing the contingency does not, of itself, create an ambiguity. Id.

In analyzing the facts, the Reiss court distinguished the Cofman case, noting that in Cofman the provision was a "sweetener" added to the settlement agreement, supporting the inference that the plaintiffs would not have agreed to a forward stock split because it would have

7

eviscerated the value of the stock. Id. at 200.  In Reiss, however, there was no risk of

eviscerating value of the warrants in subversion of the intended "sweetener" for the plaintiffs.

The Cofman court took a second step of reasoning that "just as plaintiffs should not suffer from

the possibility of dilution of their warrants resulting from a stock split, so too [defendant] should

not suffer from the consolidation of its shares resulting from a declaration of a reverse stock

split." Id. (internal citation omitted).  The Reiss Court declined to take this second step because

it "does not necessarily follow from the first." Id.  The Court held:

> It may be that [plaintiff] would be entitled to a remedy if [defendant] performed a
> forward stock split, on the theory that he 'did not intend to acquire nothing.'  We
> should not assume that one party intended to be placed at the mercy of the other.  It
> does not follow, however, that [defendant] should be given a comparable remedy to
> save it from the consequences of its own agreements and its own decision to perform
> a reverse stock split.

Id. at 201.  (emphasis added) (internal citations omitted).  Thus, the court determined that the

warrants need not be adjusted to account for the reverse stock split authorized by the defendant.

Id. at 197, 202.

Reiss speaks to Plaintiffs' arguments in two ways.  First, it reaffirms the holding in

Cofman that a contract should be interpreted so as not to deny plaintiffs the intended function of

the "sweetener" portion of an agreement because to do so would render that part of the agreement

meaningless.  Second, it distinguishes between harms created from a party's own actions and

harms arising from the actions of another party, and suggests that when the actions of the

defendants harm plaintiffs the agreement should be interpreted to protect the plaintiffs' interests,

but where defendants' actions also harm themselves, no such protection is necessary.  Here, there

is no dispute that Defendants willingly acted to effectuate A&W's stock merger with Yorkshire,

and Yorkshire's merger with Tricon, and that Plaintiffs played no role in making either decision. In fact, Plaintiffs were allegedly not notified or consulted prior to either decision; this portion of Reiss supports Plaintiffs' arguments.

As in the instant case, Reiss involved stock warrants that were complete in terms of having all the necessary information (number of shares, price, expiration date) sufficient to be enforceable as contracts to purchase stock. Defendants argue that the Warrants grant no further rights beyond the conditional ability to purchase stock under the specified terms in the event that an A&W IPO occurs. Defendants assert that it undertook no contractual obligations pursuant to the Warrants to guarantee, to take steps to make more likely, or even to take steps to avoid making less likely, the IPO. Here, Plaintiffs have not acquired "nothing." Plaintiffs' rights acquired initially through the Warrant are the same rights that exist now. It is only the likelihood of the condition precedent (the IPO) occurring that has changed over time through the actions of the Defendants, but that likelihood is not a part of the rights granted in the Warrant. The critical question is whether or not the Warrant should nevertheless be interpreted to have "incorporated" Plaintiffs' expectations of an A&W IPO, and therefore import as a right granted by the Warrants the preserved probability of an IPO occurring.

While the three cases relied upon by Plaintiffs lend some support to their arguments, each of the cases dealt with the conditions precedent to the rights of the plaintiffs to purchase stock which had occurred, and the disputes were over the terms of the stock purchases. Here, the uncertainty of whether or not an IPO would occur existed at the time of the drafting of the Warrant. The Warrant language contains no reference to the preservation of the likelihood of an A&W IPO, but grants rights to purchase a certain number of shares "after the completion of the

9

IPO." Compl. Ex. A.  On its face, the Warrant is not ambiguous and includes all the terms necessary to enforce the Plaintiffs' rights to purchase stock under specified terms, subsequent to an A&W IPO.  Because the agreement is not ambiguous, the court cannot imply a term where the circumstances indicate the parties foresaw the contingency.  Reiss, 97 N.Y.2d at 199.

Plaintiffs assert that the contingency was foreseen and discussed.  Plaintiffs allege that Sidney Feltenstein ("Feltenstein"), former chairman of the board of directors, represented to Plaintiffs at the time of the warrant agreement that "A&W's business plan called for such an offering in several years, perhaps as soon as 10-12 months from closing or when earnings reached $3-4 million annually." FAC ¶¶ 5, 9.  Plaintiffs allege Feltenstein represented the IPO was the "only plan A&W had for the future of the company," and that it was the "exit mechanism" for A&W's senior officers. Id. ¶ 9.  Plaintiffs state that they were told by Feltenstein and A&W that a leading securities analyst opined that "if A&W met its projections it could go public . . . and that if [Plaintiffs] took a warrant for $3 million of stock they 'could see the return they were seeking quite shortly, with, we believe, a significant opportunity for greater appreciation.'" Id. ¶ 10.  Plaintiffs assert that "[t]he effect of the warrant was to give [Plaintiffs] an opportunity to recapture a $3 million purchase-price reduction if A&W was successful and if Feltenstein and the other A&W owners were able to sell their stock for cash." Id. ¶ 11.  Plaintiffs assert that the share exchange put Plaintiffs' interests at a lower corporate level, preventing them from retiring their Warrants at the same time that the Yorkshire stockholders were able to do so. Id. ¶ 25.  Plaintiffs admit that prior to the stock exchange with Yorkshire, Sagittarius, A&W's parent, "began the IPO process" and "planned an IPO" while "[making] efforts" to go public. Id. ¶¶ 19, 22.

It is not alleged that the A&W IPO was an event guaranteed to occur, or even an action promised or assured by the Defendants.  Optimistic remarks by a company's chairman about the likelihood of the company's future success, and analyst predictions opining an "if/then" conditional projection, are not sufficient for the court to impose implied contractual obligations on the Defendants.  It is reasonable to presume that the parties foresaw and anticipated at the time of the drafting of the Warrant the uncertain or conditional nature of A&W going public in the future, given the unpredictability of the marketplace and business.  Accordingly, the Warrant must be enforced on its terms, and no implied terms will be imported into the contractual requirements.  The Warrant does not include the preservation of the likelihood of an A&W IPO as one of the Plaintiffs' rights that Defendants have an obligation to protect against impairment or dilution under the terms of the no-impairment clause of the Warrant.  Compl. Ex. A ¶ 6. Therefore, Plaintiffs fail to state a claim under Federal Rule of Civil Procedure 12(b)(6), and Defendants' Motion to Dismiss the breach of contract (impairment) claim must be granted.

**B.     Count Two (Breach of Contract – De Facto IPO)**

Plaintiffs next argue that the merger of Yorkshire with Tricon, an already public company, constitutes a de facto IPO of A&W, thereby triggering their purchase rights under the Warrant.  Plaintiffs rely on the Indiana case of Gabhart v. Gabhart, 370 N.E.2d 345 (Ind. 1977), as an example of a court adopting a de facto dissolution.  Id. at 356 ("[A] proposed merger which has no valid purpose . . . intended to advance a corporate interest, and which merger would eliminate or reduce a minority shareholder's equity, may be challenged, as a de facto dissolution, by shareholders entitled to vote upon an issue of dissolution.").  However, because Gabhart "created substantial uncertainty" about minority shareholder rights the Indiana legislature later

expressly rejected the ruling. <u>See</u> <u>National Board of Examiners for Osteopathic Physicians and Surgeons, Inc. v. American Osteopathic Assoc.</u>, 645 N.E.2d 608, 622 (Ind. Ct. App. 1994).

Michigan[1] has not directly addressed the issue of a de facto IPO regarding shareholder rights, but has applied the de facto merger doctrine in a fact pattern where creditors rights were impacted. <u>Turner v. Bituminous Cas. Co.</u>, 244 N.W.2d 873, 889 (Mich. 1976). The <u>Turner</u> dissent noted the intention of the Michigan Law Review Commission to reject the de facto merger doctrine with respect to shareholder rights. <u>Id.</u> at 889 n.3 (Coleman, J., dissenting). Thus, to accept Plaintiffs' argument here would be to recognize a new cause of action based on an equitable doctrine of a de facto IPO. Plaintiffs caution that "[t]he court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts, rather than a pleader's suppositions." Pls.' Objection at 5 (citing 5A Charles A. Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u>, § 1357 at 343 (1990) (citing cases)). However, even creative and inventive legal theories must comport with Rule 12 standards.

Judge Boylan's analysis of this issue in the R&R is sound, and this Court agrees. <u>See</u> R&R at 10-12. To deem the merger of A&W's parent company, Yorkshire, with an already-public company, Tricon, to be a de facto IPO of the subsidiary A&W, would be inappropriate. Defendants' Motion to Dismiss the de facto IPO claim is granted.

**C.     Count Three (Unjust Enrichment)**

Plaintiffs assert a claim for unjust enrichment based on Defendants' "purchas[ing]

---

[1] Michigan law applies to this case pursuant to the choice of law provision in the Warrant. <u>See</u> R&R at 5.

Carousel assets for cash and warrants and then later [selling] those assets to Tricon under circumstances where the warrants will never be exercised." Defs.' Objection at 6. Plaintiffs claim that the warrants should equitably be considered as liens on the A&W assets which are now owned by Tricon, because the cash returned for those assets went to Feltenstein and his co-venturers. FAC ¶¶ 50-51. Defendants argue that the Warrants do not prohibit entering into transactions that might render an A&W IPO less likely as a business decision and strategic objective.

"Where an express contract exists, there can be no implied [in law] contract with respect to the same subject matter.'" Ventura v. Titan Sports, Inc., 65 F.3d 725, 730 (8th Cir. 1995) (internal citation omitted); Campbell v. City of Troy, N.W.2d 547, 549 (Mich. Ct. App. 1972) ("There cannot be an express and implied contract covering the same subject matter at the same time."). However, Plaintiffs assert that the existence of an express contract does not bar the equitable remedy of unjust enrichment because "if an existing contract does not address the benefit for which recovery is sought, quantum meruit is available regarding those items about which the contract is silent." Id. Plaintiffs allege the loss of the opportunity to recover $3.45 million because A&W, Feltenstein and others "arranged for a transaction that destroyed or impaired the value of that opportunity," in effect keeping the value for themselves. FAC ¶¶ 50-51.[2] Plaintiffs also allege fraud in the inducement of the contract. See Ventura, 65 F.3d at 733 (holding that fraud rescinded a contract opening the door for a quantum meruit claim).

---

[2] Defendants contest the assertion that Plaintiffs would "recover" $3.45 million upon exercise of the Warrants. Defendants argue that the Warrants confer on Plaintiffs the right to spend $3.45 million to purchase shares of A&W at the IPO price in the event of an IPO. Defendants assert that Plaintiffs would not realize a gain of $3.45 million unless A&W stock doubled in value subsequent to the IPO. See Defs.' Response at 4 n.2.

To prove a claim for unjust enrichment, a plaintiff must establish there was (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant. Barber v. SMH (US), Inc., 509 N.W.2d 791, 796 (Mich. Ct. App. 1993). Here, the express contract was negotiated to provide Plaintiffs received $11 million cash for the sale of Carousel plus the right to purchase stock at the IPO rate in the event that A&W went public. The fact that A&W has not had an IPO does not translate to the receipt of a benefit by the Defendants such that they are unjustly enriched. The express contract covers the subject matter of Plaintiffs' unjust enrichment claim, and is therefore not an allowable remedy. Id. Defendants' Motion to Dismiss is granted because Plaintiffs fail to state an unjust enrichment claim upon which relief can be granted.

**D.      Count Four (Promissory Estoppel)**

Under Michigan law, the equitable remedy of promissory estoppel is allowed when

(1) there is a promise (2) that the promisor should have reasonably expected to induce action of a definite and substantial character on the part of the promisee (3) which in fact produces reliance or forbearance of that nature (4) under circumstances such that the promise must be enforced if injustice is to be avoided.

Barber, 509 N.W.2d at 797. In order to support a claim of estoppel, a promise must be "definite and clear," and the doctrine is "cautiously applied." Id. (internal citations omitted).

Plaintiffs allege that Feltenstein "assured" them that A&W's business plan called for an IPO within several months to several years, that a security analyst opined that A&W could go public by late 1997, and if so Plaintiffs could see the return they were seeking, that Feltenstein had a plan to take A&W public as the sole exit mechanism, and that Plaintiffs would enjoy an opportunity to exit at the same time as Feltenstein and the other insiders. FAC ¶¶ 9, 10, 54, 58.

14

Plaintiffs claim that the only contingency to an IPO was A&W's profitability. Id. ¶ 30.

The language alleged by Plaintiffs as the basis for the promissory estoppel claim does not rise to the level of "definite and clear" promises made by Defendants. All of the statements made are predictive or opinion-based in substance, or conditional in form. The evidence does not establish that Defendants promised that A&W would go public, nor did Plaintiffs seek to incorporate such a safeguard or guarantee in the Warrants. "Promissory estoppel may not be used to override the express agreement of the parties contained in written agreements." API Assocs., Inc. v. North Am. Philips Corp., 317 F.3d 610, 617 (6th Cir. 2003). Plaintiffs' promissory estoppel claim does not state a claim on which relief can be granted; Defendants' Motion to Dismiss is granted on count four.

**E.      Count Five (Fraud vs. Feltenstein)**

Plaintiffs object to Judge Boylan's determination that: "Phrases such as 'assuming good performance,' 'poised to engage,' 'planned to take,' 'could go public,' 'could reasonably expect,' [and] 'if the insiders sold,' are examples of predictions of future events or conditions" insufficient to sustain a claim of fraud with the requisite particularity provided for by Federal Rule of Civil Procedure 9(b). R&R at 17. Defendants assert that Plaintiffs must allege Feltenstein did not have an intention of performing these acts at the time the statements were made, which Plaintiffs did not. Defs.' Resp. at 9.

Plaintiffs argue a predictive statement contains at least three implicit factual assertions that may be actionable fraud: (1) whether the speaker genuinely believes the statement is accurate, (2) if a reasonable basis exists for that belief, and (3) whether or not the speaker knows of any undisclosed facts that would tend seriously to undermine the statement's accuracy. See

Rubenstein v. Collins, 20 F.3d 160, 166 (5th Cir. 1994) (allowing predictive statements about the purchase or sale of securities as the basis for a fraud claim under Rule 10b-5).  Plaintiffs allege that Feltenstein made specific statements concerning his present IPO plans, and that he "omitted to tell Lieberman that he was also considering alternative exit strategies that did not include an IPO."  FAC ¶¶ 9-10, 58-59.  Plaintiffs assert that they were induced to perform on the assertion that an A&W IPO was in essence certain, provided the company performed well.

Plaintiffs allegations do not constitute an actionable claim of fraud.  "Broken promises generally do not constitute fraud unless the plaintiff shows affirmative evidence that the promisor had no intention to perform."  Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d 1386, 1393 (8th Cir. 1997) (internal citations omitted).  Feltenstein's statements were general statements, and are not representations of future certainties.

The FAC contains evidence showing that Defendants intended to pursue, and did pursue, an A&W IPO in the years after the Warrants were issued.  FAC ¶¶ 19-22.  The fact that the business plan for A&W changed several years later does not, by itself, render Feltenstein's statements fraudulent.  Plaintiffs offer no evidence showing that Feltenstein knew that the stock exchange or merger would definitely occur, or that Feltenstein acted in bad faith.  Defendants' Motion to Dismiss Plaintiffs' fraud claim is granted.

16

### III.  CONCLUSION

Based upon the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Plaintiffs' Objection [Docket No. 16] is **DENIED**,

2.  The R&R [Docket No. 14] is **ADOPTED**, and

2.  Defendants' Motion to Dismiss [Docket No. 6] is **GRANTED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: *May 28, 2003*

17

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd